IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ALACRITECH INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:16-CV-00693-RWS-RSP |
| | § | (LEAD CASE) |
| CENTURYLINK, INC. *et al,* | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM ORDER

Before the Court are five motions to strike (**Dkt. Nos. 631, 638, 641, 648, 794**). As an initial matter, Defendant Dell, Inc. and Intervenor Intel Corporation's (collectively, "Defendants") Motion to Strike the Errata to the Deposition of Alacritech's Damages Expert Lance Gunderson (**Dkt. No. 794**) is **DENIED AS MOOT** based on representations from counsel at the September 28, 2023 Pretrial Conference.

There are now four motions pending before the Court: (1) Intel's *Daubert* Motion to Exclude Testimony of Alacritech's Damages Expert Lance Gunderson (**Dkt. No. 631**); (2) Dell's *Daubert* Motion to Exclude Testimony of Alacritech's Damages Expert Lance Gunderson (**Dkt. No. 648**); (3) Plaintiff Alacritech Inc.'s *Daubert* Motion to Exclude Testimony of John L. Hansen (**Dkt. No. 638**); and (4) Alacritech's *Daubert* Motion to Exclude Testimony of W. Christopher Bakewell (**Dkt. No. 641**). As explained below, two motions (**Dkt. Nos. 638, 641**) are **GRANTED IN PART**. Otherwise, the motions (**Dkt. Nos. 631, 638, 641, 648**) are **DENIED**.

## I.    BACKGROUND

On June 30, 2016, Plaintiff Alacritech Inc. filed suit against Defendants CenturyLink, Inc., Tier 3, Inc., Savvis Communications Corp., CenturyLink Communications LLC, Cyxtera

1

Communications, LLC, Winston Corporation, Wiwynn Corporation, SMS InfoComm Corporation, and Dell Inc. alleging certain server products and methods infringe eight of Alacritech's patents.[1] Intel Corporation intervened in this case on November 21, 2016, and Cavium, Inc. intervened on February 14, 2017, both asserting that their products were implicated in the infringement allegations. Dkt. No. 84 (Intel); Dkt. No. 127 (Cavium).

This case proceeded through discovery and was stayed pending disposition of *inter partes* review (IPR) proceedings that had been instituted by the Patent Trial and Appeal Board. Dkt. No. 451. The PTAB invalidated multiple claims challenged in IPRs, Alacritech appealed that decision, and the Court continued the stay pending resolution of the Federal Circuit appeal. Dkt. No. 482. In 2022, following the appeal proceedings, Alacritech moved to lift the stay and proceed with its case on the surviving patents and claims.

The Court lifted the stay and entered Docket Control Orders for the respective cases. *See* Dkt. No. 786 (setting February 20, 2024 trial date for certain defendants in the 2:16-CV-693 and 2:16-CV-692 cases); 2:16-CV-00695-RWS-RSP, Dkt. No. 19 (setting October 16, 2023 trial date for Dell). Now, Alacritech asserts claim 1 of U.S. Patent No. 7,124,205 (the "'205 Patent"), claims 17 and 22 of U.S. Patent No. 8,805,948 (the "'948 Patent"), and claim 41 of U.S. Patent No. 8,131,880 (the "'880 Patent") (collectively, "Asserted Patents") against Defendant Dell Inc. and Intervenor Intel Corporation of the '695 Member Case, and Defendants Winstron Corporation, Wiwynn Corporation, SMS InfoComm Corporation of the '692 Member Case.[2] *See* Dkt. No. 522 at 1.

---

[1] Defendants Winston Corporation, Wiwynn Corporation, and SMS InfoComm Corporation were consolidated for pretrial from Case No. 2:16-CV-692-RWS-RSP, and Defendant Dell Inc. was consolidated for pretrial from Case No. 2:16-CV-695-RWS-RSP.

[2] The other defendants and intervenor Cavium are no longer in the case or will soon be dismissed.

## II.    LAW

In a suit for patent infringement, a successful plaintiff is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. An assessment of the reasonable royalty generally involves opinions by expert witnesses.

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702.

Rule 702 requires that judges act as gatekeepers to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). However, "[t]he inquiry envisioned by Rule 702 is ... a flexible one." *Id.* at 594; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("*Daubert* makes clear that the factors it mentions do *not* constitute a 'definitive checklist or test.'"). While the party offering the expert bears the burden of showing that the testimony is reliable, it "need not prove to the judge that the expert's testimony is correct...." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 1999) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998)). Ultimately, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional

and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

### III.   INTEL'S *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF ALACRITECH'S DAMAGES EXPERT LANCE GUNDERSON (DKT. NO. 631)

#### A.  Background Facts

Alacritech retained Lance Gunderson as its damages expert. Mr. Gunderson has an MBA from Texas A&M University, specializes in intellectual property damages, has experience assessing patent infringement damages in the fields of semiconductors, electronics, software, and the Internet, has been qualified as a damages expert in more than 20 patent infringement trials, and he is a Managing Director of Echelon Analytics LLC's intellectual property practice. Dkt. No. 689-2 (June 6, 2023 Gunderson Damages Report) at ¶ 5, Sched. 1, 2.

Mr. Gunderson opines that a reasonable royalty would be the appropriate measure of damages in this case against Intel and Dell. *Id.* at ¶ 10. To determine the reasonable royalty, Mr. Gunderson evaluates the 15 separate *Georgia-Pacific* factors. *Id.* at ¶ 9 (citing *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)); *see generally MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1364–65, 69–70 (Fed. Cir. 2021) (applying *Georgia-Pacific* factors to reasonable royalty analysis).

Mr. Gunderson determines that five patent licenses—between Alacritech and QLogic, Neterion, Chelsio, Emulex, and NetXen ("Patent Licenses")—are comparable to the hypothetical negotiation between Alacritech and Defendants in this case. *Id.* ¶ 261. He determined the Patent Licenses are technically comparable, relying on Dr. Kevin Almeroth (Alacritech's infringement expert), based on his understanding that Alacritech provided rights to its patents, including the Asserted Patents, restricted to the TCP Offload Engine ("TOE") field of use—which did not include the Receive Side Coalescing ("RSC") technology covered by the Asserted Claims. *Id.*

¶¶ 258–263 (citing Dr. Almeroth's Infringement Report). Based on his discussion with Dr. Almeroth and Dr. Almeroth's report, Mr. Gunderson's understanding is that the patented RSC technology would provide technical benefits that are superior to the patented TOE technology, and the benefits from RSC have grown as network speeds and traffic have increased. *Id.* at ¶ 263.

Mr. Gunderson also determined that the Patent Licenses are economically comparable to the hypothetical patent licenses. First, he opines they are economically comparable because (1) both involve network communications products, (2) both involve the same types of devices, (3) both involve similar types of networking components in the systems in which they are used, (4) and both provide similar features and benefits. *Id.* ¶ 264–73. Second, he states that the licensees are similarly situated to Defendants. *Id.* at ¶ 264.

To apportion the reasonable royalty based on the incremental value of the patented technology, Mr. Gunderson uses the Patent Licenses to determine apportioned royalty bases and an apportioned royalty rate. *Id.* at ¶ 264.

To determine Defendants' apportioned royalty bases, Mr. Gunderson accounts for differences between the Patent Licenses and the hypothetical negotiation. *Id.* ¶ 105. For example, in calculating the apportioned royalty bases, he applies the compensation structure from the Patent Licenses: net revenues from sales of the accused products up to the "board level" (the licensed products in the Patent Licenses include offload-capable board-level and chip products). *Id.* ¶ 106. For accused products that included more than the board-level—for example servers—Mr. Gunderson reduced the accused product revenue down to the estimated apportioned board-level product revenue using the weighted-average market selling price of Intel accused products sold at the board-level. *Id.* ¶¶ 107, 110.

In analyzing the apportioned royalty rate, Mr. Gunderson assess differences between the hypothetical negotiation and Patent Licenses and correspondingly adjusts his royalty in his evaluation of the *Georgia-Pacific* factors. *Id.* ¶¶351–74.

After determining the apportioned royalty rate, Mr. Gunderson calculates the reasonable royalty by multiplying the apportioned royalty rate by the apportioned royalty base for each Defendant. *Id.* ¶ 576.

Intel seeks to exclude Mr. Gunderson's damages opinions as allegedly failing to satisfy the reliability requirements of Rule 702 and *Daubert*. Motion, Dkt. No. 631 at 1. For the reasons below, the Court holds that Mr. Gunderson's opinions satisfy the reliability standards of Rule 702 and *Daubert*.

### B.  Analysis

Intel argues that Mr. Gunderson's damages opinions are unreliable because (1) his damages opinions allegedly violate apportionment law, and (2) Mr. Gunderson's apportioned royalty rate of 4–8% is arbitrary and should be excluded. Motion, Dkt. No. 631 at 5–15.

#### 1.  Mr. Gunderson's Opinions Do Not Violate Apportionment Law

First, Intel argues that Mr. Gunderson's damages opinions violate apportionment law because (i) they fail to account for the non-asserted patents covered by the Patent Licenses, and (ii) they improperly use Intel's accused revenues.

##### a.  *Mr. Gunderson's Use of the Patent Licenses Does Not Violate Apportionment Law*

In essence, Intel argues that Mr. Gunderson uses the 5% royalty rate from the Patent Licenses as a starting point for his analysis here, but he does not adequately address that the Patent Licenses included many other patents that are not asserted in this case. Motion, Dkt. No. 631 at 7–9 (citing 631-2 (Gunderson 6/13/2023 Dep. Tr.) at 71:17–20, 85:12–86:5, 91:18–93:21).

6

According to Intel, that failure warrants exclusion under Federal Circuit authority. *Apple Inc. v. Wi-LAN Inc.,* 25 F.4th 960, 973 (Fed. Cir. 2022) (holding expert's opinions were unreliable where he failed to address the extent to which five of the six patents contributed to the royalty rate in a comparable license, while still opining that excluding those five patents would have only resulted in a 25% discount); *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1328–29 (Fed. Cir. 2014) (holding expert's opinion should have been excluded for failure to apportion value of non-patented technology); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (holding expert's opinions were unreliable because he arbitrarily reduced the royalty rate by 2/3 "based on vague qualitative notions of the relative importance" of the technology at issue).

The Federal Circuit has held "that when a sufficiently comparable license is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required." *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020) (collecting cases). "That is because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have 'built-in apportionment,'" which "effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Id.* at 1040–41. "Use of actual past licenses and negotiations to inform the hypothetical negotiation does not 'require[ ] identity of circumstances.'" *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys.*, LLC, 927 F.3d 1292, 1301 (Fed. Cir. 2019) (quoting *Virnetx, Inc v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014)).

The Court is not persuaded that Mr. Gunderson's analysis is inconsistent with Federal Circuit authority. He determines the Patent Licenses are both technically comparable—relying on Dr. Almeroth—and economically comparable, and he utilizes the "built-in apportionment" that those Patent Licenses include for his 5% royalty rate starting point. Further, Mr. Gunderson

acknowledges that the scope of the Patent Licenses is restricted to the field of use of TOE, which Dr. Almeroth opines is technologically comparable to the RSC technology at issue here. Intel's experts do not dispute that the Patent Licenses are limited to TOE technology, or that TOE technologically comparable to RSC. *Apple* is distinguishable because that case involved licenses covering additional patents with non-comparable technology that the damages expert did not analyze, whereas the Patent Licenses here include a field-of-use restriction to the TOE technology that is comparable to the RSC technology of the accused products. *See Apple*, F.4th at 972.

Consequently, Mr. Gunderson's damages opinions adequately address the other patents included in the Patent Licenses in accordance with apportionment law.

> b. *Mr. Gunderson's Use of Intel's Revenues Does Not Violate Apportionment Law*

Intel also argues that Mr. Gunderson improperly uses Intel's accused revenues for his damages opinions. Motion, Dkt. No. 631 at 9–14. Intel bifurcates its arguments into two categories: (1) Intel's accused adapters, controllers, and cards; and (2) Intel's accused system-on-a-chip ("SoC") and servers. *Id.*

In the context of a multi-component product containing at least one feature covered by the patents in suit, the Federal Circuit has "held that apportionment can be addressed in a variety of ways, including 'by careful selection of the royalty base to reflect the value added by the patented feature [or] ... by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof.'" *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)). "The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Exmark*, 879 F.3d at 1348.

Intel argues that Mr. Gunderson's damages opinions as to Intel's accused adapters, controllers, and cards are fatally flawed because there he does not account for dozens of non-accused features contained in those products. Motion, Dkt. No. 631 at 10. Intel argues that Alacritech cannot show that the references to revenues are proper under the "entire market value rule" or under the "built-in apportionment" from prior licenses. Similarly, Intel argues that Mr. Gunderson's use accused SoC and server revenues is improper because there are hundreds of non-accused features, so his 1% apportionment number evinces his arbitrary methodology. *Id.* at 12–14. The Court disagrees.

As previously discussed, Mr. Gunderson relies on the Patent Licenses and analyzes their economic and technical comparability to the accused products here to determine the reasonable royalty. And Mr. Gunderson acknowledges that the scope of the Patent Licenses is restricted to the field of use of TOE, and he relies on Dr. Almeroth's opinions that TOE is technologically comparable to the RSC technology at issue here. Accordingly, the requirements to rely on "built-in apportionment" have been satisfied. *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1375 (Fed. Cir. 2021) (holding built-in apportionment cannot apply where the expert "conducted no assessment of the licensed technology versus the accused technology to account for any differences."). Accordingly, Mr. Gunderson provides an adequate basis to rely on the "built-in apportionment" from the Patent Licenses.

### 2. Mr. Gunderson's 4–8% Royalty Rate is Sufficiently Tied to the Facts of the Case

Second, Intel challenges Mr. Gunderson's 4–8% royalty rate range as arbitrary and not supported by any reliable methodology. Motion at 14–15. According to Intel, Mr. Gunderson fails to provide any math or analysis whatsoever in arriving at his royalty rate range. *Id.* at 15.

Mr. Gunderson analyzes the Patent Licenses under *Georgia-Pacific* factors 1 and 2 and uses the same royalty rate as a starting point. As he analyzes *Georgia-Pacific* factors 3–15, he

adjusts his royalty rate to arrive at the 4–8% range. Consequently, Mr. Gunderson follows the appropriate reasonable royalty methodology used in patent cases, and his results are sufficiently tied to the facts of the case. *Summit 6*, 802 F.3d at 1296 ("But where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder."). There may be questions regarding the correctness of Mr. Gunderson's apportioned royalty base, apportioned royalty rate, and his reasonable royalty results, but assessments as to credibility and correctness are for the factfinder, not the Court. *Id.* The inquiry into the correctness of Mr. Gunderson's analysis can be properly explored through vigorous cross-examination and presentation of contrary evidence. *Daubert*, 509 U.S. at 596.

### C. Conclusion

For the reasons above, Intel's *Daubert* Motion to Exclude Testimony of Alacritech's Damages Expert Lance Gunderson (**Dkt. No. 631**) is hereby **DENIED**.

## IV. DELL'S *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF ALACRITECH'S DAMAGES EXPERT LANCE GUNDERSON (DKT. NO. 648)

### A. Background Facts

As previously discussed in Section III(A), Mr. Gunderson is Alacritech's damages expert who performs a reasonable royalty analysis based on the Patent Licenses.

Dell seeks to exclude Mr. Gunderson's damages opinions for allegedly failing to satisfy the reliability requirements of Rule 702 and *Daubert*. Motion, Dkt. No. 648 at 1. For the reasons below, the Court holds that Mr. Gunderson's opinions satisfy the reliability standards of Rule 702 and *Daubert*.

### B.  Analysis

Dell seeks to exclude Mr. Gunderson's opinions on five separate grounds: (1) he relies on allegedly non-comparable agreements that expressly excluded the claimed technology, and included enabling events that drove down the practical value of those licenses; (2) he allegedly failed to apportion the value of the Asserted Patents from the non-comparable Patent Licenses; (3) he allegedly arbitrarily adjusted the rate from those licenses to create a final range of royalty rates; (4) he allegedly failed to apportion the value of the accused technology within his chosen royalty base; and (5) his non-infringing alternative analysis is allegedly unreliable. Motion, Dkt. No. 648 at 6–12.

1. <u>Mr. Gunderson's Analysis is Sufficient to Establish the Comparability of the Patent Licenses</u>

First, Dell argues that the Patent Licenses are not comparable as they do not license the accused technology, the Patent Licenses require an enabling event—the end user must actually use the licensed technology for the royalty rate to apply, and the Patent Licenses are between Alacritech and a competitor chip maker. *Id.* at 6–7 (citing *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010)).

Here, Mr. Gunderson uses the Patent Licenses as part of his *Georgia-Pacific* factor analysis to determine a reasonable royalty. In contrast to *ResQNet.com*, Mr. Gunderson establishes a sufficient relationship between the accused RSC technology and the TOE technology licensed in the Patent Licenses through testimony of Alacritech's technical expert, Dr. Almeroth. Dkt. No. 707-2 (June 6, 2023 Gunderson Damages Report) at ¶¶ 101, 262–63; *Elbit,* 927 F.3d at 1301 ("Use of actual past licenses and negotiations to inform the hypothetical negotiation does not 'require[ ] identity of circumstances.'"). Additionally, the Patent Licenses themselves indicate that the enabling events give customers the ability to use the TOE functionality after certain enabling keys

11

are applied. Dkt. No. 707-3 (QLogic License) at 3–4; Dkt. No. 707-4 (Velturo 6/19/23 Dep. Tr.) at 59:10–60:4. Mr. Gunderson testified that the Patent Licenses are similar to the hypothetical negotiation because a royalty rate is applied to revenues for accused products that are enabled—allowing customers to use the RSC functionality. Dkt. No. 707-5 (Gunderson 6/13/23 Dep. Tr.) at 197:21–198:11. Mr. Gunderson also accounts for Alacritech viewing Dell as a potential customer in his reasonable royalty analysis of *Georgia-Pacific* factor 5, and he provides a rationale as to why this factor would upwardly influence the reasonable royalty. Dkt. No. 707-2 (June 6, 2023 Gunderson Damages Report) at ¶¶ 374–78.

2. Mr. Gunderson's Royalty Rate Apportionment Analysis is Not Contrary to Law

Second, Dell argues that Mr. Gunderson failed to apportion his royalty rate from the Patent Licenses he uses as a starting point because he failed to apportion out the unasserted patents.

As previously discussed in Section III(B)(i)(a), the Court is not persuaded that Mr. Gunderson's analysis is inconsistent with Federal Circuit authority. He understands that the scope of the Patent Licenses has a restricted field of use to TOE technology, he determines the Patent Licenses are both technically comparable—relying on Dr. Almeroth—and economically comparable, and he utilizes the "built-in apportionment" that those Patent Licenses include for his 5% royalty rate starting point. *Vectura*, 981 F.3d at 1040. Consequently, Mr. Gunderson's damages opinions adequately address the other patents included in the Patent Licenses in accordance with apportionment law.

3. Mr. Gunderson's Provides Adequate Analysis for His Royalty Rate Adjustment

Third, Dell contends that Mr. Gunderson's royalty rate does not rely on any discernable methods and appears to have been arbitrarily plucked out of thin air. Dell argues that his adjustment

violates Federal Circuit authority. *LaserDynamics*, 694 F.3d at 69; *Exmark*, 879 F.3d at 1351; *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 33 (Fed. Cir. 2012).

"[T]here is no blanket rule of *quantitative* apportionment in every comparable license case." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1376 (Fed. Cir. 2020) (emphasis in original). When apportioning through the royalty rate, the Federal Circuit recognizes that "one possible way to do this is through a proper analysis of the *Georgia-Pacific* factors." *Exmark*, 879 F.3d at 1348–49 (citing *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015)). "[T]he standard *Georgia–Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation." *AstraZeneca*, 782 F.3d at 1338. When the royalty rate is derived from "sufficiently comparable" license agreements, the "method is typically reliable" as consistent with the *Georgia-Pacific* factors. *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed Cir. 2015).

Here, Mr. Gunderson determines that the Patent Licenses are comparable and he uses the royalty rate from those agreements as a starting point for the remainder of his *Georgia-Pacific* analysis. Dkt. No. 707-2 (June 6, 2023 Gunderson Damages Report) at ¶¶ 351–574. He determines factors 2, 3, 6, 7, and 12 have a neutral influence on the starting royalty, factors 4, 5, 8, 9, 10, and 11 upwardly influence the starting royalty, and factor 13 has a downward influence on the starting royalty. *Id.* at ¶ 573. The culmination of his analysis is that, in Mr. Gunderson's opinion, the royalty rate is from 4–8%. *Id.* at ¶¶ 569–574. The cases Dell cites are distinguishable because Mr. Gunderson's analysis of the royalty rate is based on analysis of the *Georgia-Pacific* factors using the sufficiently comparable Patent Licenses.

4.  Mr. Gunderson's Royalty Base Apportionment Analysis is Not Contrary to
    Law

Fourth, Dell argues that Mr. Gunderson failed to apportion his royalty base and instead improperly applied his rate to the entire revenue figure of his hypothetical board-level product rather than to the portion of the product that reflects the value of the accused feature.

As previously discussed in Section III(B)(i)(b), the Court is not persuaded that Mr. Gunderson's analysis is inconsistent with Federal Circuit authority. He understands that the scope of the Patent Licenses has a restricted field of use to TOE technology, he determines the Patent Licenses are both technically comparable—relying on Dr. Almeroth—and economically comparable, and he utilizes the "built-in apportionment" that those Patent Licenses include for his 5% royalty rate starting point. *Vectura*, 981 F.3d at 1040. Consequently, Mr. Gunderson's damages opinions adequately address the other patents included in the Patent Licenses in accordance with apportionment law.

As previously discussed, Mr. Gunderson relies on the Patent Licenses and analyzes their economic and technical comparability to the accused products here to determine the reasonable royalty. And Mr. Gunderson acknowledges that the scope of the Patent Licenses is restricted to the field of use of TOE, and he relies on Dr. Almeroth's opinions that TOE is technologically comparable to the RSC technology at issue here. Accordingly, the requirements to rely on "built-in apportionment" have been satisfied. *MLC*, 10 F.4th at 1375 (holding built-in apportionment cannot apply where the expert "conducted no assessment of the licensed technology versus the accused technology to account for any differences."). Accordingly, Mr. Gunderson provides an adequate basis to rely on the "built-in apportionment" from the Patent Licenses.

5. <u>Mr. Gunderson's Royalty Base Analysis is Not Contrary to Law</u>

Finally, Dell argues that Mr. Gunderson's technical non-infringing alternative analysis is unreliable because he wholesale rejects widely adopted non-infringing alternatives to the accused RSC feature.

Here, Mr. Gunderson analyzes non-infringing alternatives with regard to *Georgia-Pacific* factors 9 and 10. Dkt. No. 707-2 (June 6, 2023 Gunderson Damages Report) at ¶ 497. Mr. Gunderson relies on Dr. Almeroth's technical analysis—concluding that Defendants' proposed alternatives are not technically acceptable—and so Mr. Gunderson opines that there are none. *Id.* at ¶¶ 497–502.

In sum, Mr. Gunderson follows the appropriate reasonable royalty methodology used in patent cases, and his results are sufficiently tied to the facts of the case. *Summit 6*, 802 F.3d at 1296 ("But where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder.") There may be questions regarding the correctness of Mr. Gunderson's apportioned royalty base, apportioned royalty rate, his opinions regarding non-infringing alternatives, and his reasonable royalty results, but assessments as to credibility and correctness are for the factfinder, not the Court. *Id.* The inquiry into the correctness of Mr. Gunderson's analysis can be properly explored through vigorous cross-examination and presentation of contrary evidence. *Daubert*, 509 U.S. at 596.

**C. Conclusion**

For the reasons above, Dell's *Daubert* Motion to Exclude Testimony of Alacritech's Damages Expert Lance Gunderson (**Dkt. No. 648**) is hereby **DENIED**.

## V.   ALACRITECH'S *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF JOHN L. HANSEN (DKT. NO. 638)

### A.  Background Facts

Intel hired John L. Hansen as its damages expert. Mr. Hansen has degrees in commerce and finance from Santa Clara University, is a Certified Public Accountant and Chartered Global Management Accountant and has certifications in financial forensics and licensing. Dkt. No. 688-2 (Mr. Hansen 5/5/23 Damages Report) at ¶¶ 1–2; Dkt. No. 688-3 (Hansen 5/18/23 Dep. Tr.) at 9:12–16. Mr. Hansen has experience assessing patent infringement damages and licenses, has been consulted in more than 100 intellectual property matters, and he is a partner at TM Financial Forensics, an HKA Company. *Id*; Dkt. No. 688-3 (Hansen 5/18/23 Dep. Tr.) at 9:12–16.

Mr. Hansen opines that a reasonable royalty is the appropriate measure of damages in this case to assess damages with a hypothetical negotiation date occurring in the second quarter of 2009. Dkt. No. 688-2 (Mr. Hansen 5/5/23 Damages Report) at ¶ 14. In addition to performing his own analysis, Mr. Hansen criticizes Mr. Gunderson's analysis in several respects.

First, he explains that certain evidence demonstrates the Asserted Patents had not been successful during the 2009 timeframe and never generated the value that Mr. Gunderson attributes to them. *Id.* at ¶¶ 15, 31, 68–74. He notes that at the time of the hypothetical negotiation, Alacritech was operating at a loss, and statements from its own employees indicated that there was a lack of interest in the TOE technology. *Id.* at ¶ 15. Mr. Hansen explains that, over its entire history, Alacritech only made a fraction of what it now claims in damages from Intel, and additional third-party evaluations reinforce that Alacritech now overstates the value of the Asserted Patents and technology. *Id.* at ¶¶ 15, 31, 68–74.

Second, he criticizes Mr. Gunderson's analysis by showing that Alacritech's licenses of the Asserted Patents to more than a dozen others amounted to a tiny fraction of what Alacritech

16

now seeks from Defendants. *Id.* at ¶¶ 83–84, 93. One of the licenses involved Broadcom—which Mr. Hansen opines is similarly situated to Intel—and that license covered the Asserted Patents in addition to many others for a significantly lower price. *Id.* ¶¶ 90–95.

Third, Mr. Hansen opines that Alacritech's license with Broadcom is comparable along with subsequent agreements between Alacritech and Broadcom, but again notes that it only accounts for a tiny fraction relative to what Alacritech now seeks from Intel. *Id.* at ¶¶ 18, 96, 112–13.

Fourth, Mr. Hansen discusses an independent third-party valuation of the Asserted Patents in June 2010, which valued Alacritech's entire business (including patent portfolio) at a small fraction of what Alacritech seeks in damages in this case—and Alacritech's entire patent portfolio was a fraction of its business valuation. *Id.* ¶¶ 16, 75–82.

Finally, Mr. Hansen challenges Mr. Gunderston's reasonable royalty based on his use of the Patent Licenses without accounting for many factors that would lower the overall royalty. *Id.* ¶¶ 114–28, 199–201, 206, 216, 228, 235, 241, 249–67.

Alacritech seeks to exclude Mr. Hansen's damages opinions for allegedly failing to satisfy the reliability requirements of Rule 702 and *Daubert*. Motion, Dkt. No. 638 at 1. For the reasons below, the Court holds that, with the exception of the Alacritech valuation, Mr. Hansen's opinions satisfy the reliability standards of Rule 702 and *Daubert*.

## B.  Analysis

Alacritech seeks to exclude Mr. Hansens's opinions in four ways: (1) Mr. Hansen's opinions and testimony regarding Mr. Gunderson's 2017 original report because that report has been superseded and now includes irrelevant evidence and facts; (2) Mr. Hansen's opinions regarding Alacritech's company and patent portfolio valuation; (3) Mr. Hansen's opinions that

there was not a single hypothetical negotiation or single royalty rate from Defendants at different levels of the supply chain; and (4) his opinions about Intel's large patent portfolio and R&D expenditure. Motion, Dkt. No. 638 at 2–12.

### 1. Mr. Hansen is Permitted to Offer Opinions Based on His 2017 Report Consistent with the Ruling on Alacritech's MIL No. 8

First, Alacritech seeks to exclude Mr. Hansen's opinions regarding Mr. Gunderson's 2017 report on the basis that it contains irrelevant, prejudicial, and confusing material based on the narrowing of this case during the stay pending resolution of the IPR proceedings. Motion, Dkt. No. 638 at 2–5. Alacritech also argues that the law changed while this case was stayed. *California Institute of Technology v. Broadcom Limited*, 25 F.4th 976, 994 (Fed. Cir. 2022) ("*Caltech*") ("[I]n the absence of a compelling showing otherwise, a higher royalty is not available for the same device at a different point in the supply chain.").

The Court is not persuaded. Mr. Gunderson was prepared to testify at trial regarding his 2017 report prior to the case being stayed. In his 2017 report, Mr. Gunderson opined that Intel and Alacritech would have agreed, at the hypothetical negotiation, to a 5% royalty for a license to six patents covering both RSC and LRO technology, whereas now he opines that Intel and Alacritech would have agreed to a royalty between 4–8% for a license to the three Asserted Patents. Consistent with the ruling on Alacritech's MIL No. 8, Mr. Hansen is permitted to offers opinions regarding that and other inconsistencies, and Defendants may explore those inconsistencies through cross-examination; however, Defendants (including Mr. Hansen) are not permitted to discuss the reasons why other patents have been dropped.

### 2. Mr. Hansen and Other Witnesses are Precluded from Relying on the Valuation

Second, Alacritech seeks to exclude Mr. Hansen's opinions about Alacritech's valuation. Motion, Dkt. No. 638 at 5–8. Alacritech contends that the '880 and '948 Patents had not issued at

the time the valuation was conducted, the valuation did not directly value Alacritech's patent portfolio, and CFO Connection—the company that performed the valuation—did not have access to all of Alacritech's confidential information.

Intel responds that while the '948 and '880 Patents had not yet issued, the application that ultimately issued at the '880 Patent had already been filed and the application that issued at the '948 Patent was in the same family as the '205 Patent. Further, according to Intel, the valuation included Alacritech's non-cash assets, which inherently includes the Asserted Patents along with more than 50 other patents.

Mr. Hansen admitted in his deposition that the CFO Connection valuation does not actually contain a valuation of the patents. Dkt. No. 638-4 (Hansen 5/18/23 Dep. Tr.) at 201:3–9. Yet Mr. Hansen relies on it to demonstrate the value of the Asserted Patents in this case. Mr. Hansen's testimony regarding the valuation as indicative of the value of the Asserted Patents falls short of the requirements that "testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case," as required by Federal Rule of Evidence 702. FED. R. EVID. 702. Further, the valuation and any testimony regarding the valuation are excluded because any marginal relevance is substantially outweighed by the danger of unfair prejudice and misleading the jury. FED. R. EVID. 403. Cross-examination would not adequately cure the deficiencies in reliability and the unfair prejudice that may result from testimony regarding the valuation.

    3.  <u>Mr. Hansen May Testify as to Whether One or Two Hypothetical Negotiations is Appropriate and Whether Mr. Gunderson Addressed All Considerations</u>

Third, Alacritech argues that Mr. Hansen's opinions that the parties to the hypothetical negotiation would have only been Alacritech and Intel—not Dell or any of Intel's other customers—do not properly consider the facts. Motion, Dkt. No. 638 at 8–10. Alacritech also

19

contends Mr. Hansen's opinions in that regard are contrary to law. *Id.* (citing *Caltech*, 25 F.4th at 993.

In *Caltech*, the Federal Circuit stated that "in the usual case, 'a direct infringer or someone who induced infringement should pay the same reasonable royalty based on a single hypothetical negotiation analysis.'" *Id.* at 994 (citing *LaserDynamics*, 694 F.3d at 76). The Federal Circuit noted that "the mere fact Broadcom and Apple are separate infringers alone does not support treating the same chips differently at different levels of the supply chain and does not justify submitting such a two-tier damage theory to the jury" without "additional facts that might justify separate and different treatment of the same chips at different levels of the supply chain." *Id.* at 993. Therefore, "in the absence of a compelling showing otherwise, a higher royalty is not available for the same device at a different point in the supply chain." *Id.* at 994.

Here, Mr. Hansen includes four paragraphs in his report criticizing Mr. Gunderson's lack of analysis regarding his opinions that a single hypothetical negotiation would apply. Dkt. No. 688-2 (Mr. Hansen 5/5/23 Damages Report) at ¶¶ 199–202. In contrast to *Caltech*, Mr. Hansen only offers opinions on behalf of Intel—not on behalf of Intel and Dell. Alacritech asserts a different date of first alleged infringement for Intel and Dell. Mr. Hansen may properly identify the different dates of first infringement, the potential differences in positions for Intel and Dell, and how the relevant evidence may be more or less relevant to Intel and Dell. Dkt. No. 688-2 (Mr. Hansen 5/5/23 Damages Report) at ¶¶ 200–01; 688-6 (Mr. Gunderson 6/23/23 Damages report) at ¶ 564.

### 4. Mr. Hansen is Permitted to Reference Intel's Patents and Development in a Manner Consistent with the Ruling on Alacritech's Mil No. 6

Third, Alacritech argues that Mr. Hansen should be precluded from testifying about Intel's companywide patent portfolio and research and development (R&D) investments because they are

unrelated to the accused products and the prejudice outweighs any marginal relevance. Motion, Dkt. No. 638 at 11.

Consistent with the ruling on Alacritech's Mil No. 6, Mr. Hansen is permitted to testify regarding Intel's R&D generally, its efforts to develop technology and their own patents, and that it is an innovator in this space, but Intel cannot specify a dollar-amount expenditure on R&D or a specific number of patents that Intel owns.

### C. Conclusion

For the reasons above, Alacritech's Daubert Motion to Exclude Testimony of John L. Hansen (**Dkt. No. 638**) is hereby **GRANTED-IN-PART** to exclude the CFO Connection Valuation and any testimony regarding that valuation. The motion is otherwise **DENIED**.

## VI.   ALACRITECH'S *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF W. CHRISTOPHER BAKEWELL (DKT. NO. 641)

### A. Background Facts

Dell hired Christopher Bakewell as its damages expert. Mr. Bakewell has a degree in business management & administration from Bradley University and an MBA with a finance concentration from the University of Maryland. Dkt. No. 641-3 (Mr. Bakewell 5/12/23 Damages Report) at 62 (Attachment A). Mr. Bakewell has many years of experience assessing patent infringement damages and testifying at trial, and he is a managing director at Kroll, LLC. *Id* at ¶ 1, p. 62 (Attachment B).

Mr. Bakewell opines that a reasonable royalty is the appropriate measure of damages in this case to assess damages with a hypothetical negotiation date occurring in the second quarter of 2009. *Id.* at ¶¶ 7, 34. Mr. Bakewell explains that, in his view, the economic considerations of the hypothetical negotiation would be the same whether Dell alone, or Dell and Intel together

negotiated the licenses(s) to the Asserted Patents. *Id.* at ¶ 39. Mr. Bakewell performs his own quantitative analysis and also challenges Mr. Gunderson's opinions.

In his own analysis, Mr. Bakewell considers the market approach, cost approach, and income approach. *Id.* at ¶ 40 (Summary), 41–55 (Market analysis), 56–66 (Cost approach), 67–76 (Income approach). Based on each of those analyses, Mr. Bakewell concludes that a baseline royalty of no more than $500,000 is appropriate. *Id.* at ¶ 79.

Mr. Bakewell also challenges Mr. Gunderson's opinions in several ways and opines that Mr. Gunderson's analysis fails to properly reflect the incremental value of the Asserted Patents. *Id.* at ¶ 113. First, he criticizes Mr. Gunderson for disregarding non-infringing alternatives. *Id.* at ¶¶ 114, 134. Mr. Bakewell also criticizes Mr. Gunderson's reliance on the Patent Licenses, *id.* at ¶¶ 117–20, and his alleged failure to apportion, *id.* at ¶ 116, which collectively inflate his reasonable royalty analysis, *id.* at ¶ 120. Mr. Bakewell also criticizes Mr. Gunderson for disregarding Dell's evidence that disabling the RSC functionality did not significantly affect performance, *id.* at ¶ 125, and his failure to analyze the CFO Connection valuation of Alacritech's business, *id.* at ¶ 55, n. 93, 94. Finally, Mr. Bakewell contends that Mr. Gunderson inadequately accounts for differences between the licensed TOE technology and the RSC/LRO technology accused, *id.* at ¶ 135, and critiques Mr. Gunderson's royalty base for relying on a board-level product as reflecting the entire value of estimated NIC-level revenue, rather than the controller *within* the accused NIC, *id.* at ¶¶ 140, 141.

Alacritech seeks to exclude Mr. Bakewell's damages opinions for allegedly failing to satisfy the reliability requirements of Rule 702 and *Daubert*. Motion, Dkt. No. 638 at 1. For the reasons below, the Court holds that, with the exception of the CFO Connection valuation, Mr. Bakewell's opinions satisfy the reliability standards of Rule 702 and *Daubert*.

### B.  Analysis

Alacritech's *Daubert* motion to exclude Mr. Bakewell's opinions is largely duplicative of its *Daubert* motion as to Intel's damages expert, Mr. Hansen. Consequently, the Court's analysis is largely duplicative of its analysis with respect to Alacritech's *Daubert* motion as to Mr. Hansen (Dkt. No. 638).

#### 1.  Mr. Bakewell is Permitted to Offer Opinions Based on His 2017 Report Consistent with the Ruling on Alacritech's MIL No. 8

First, Alacritech seeks to exclude Mr. Bakewell's opinions regarding Mr. Gunderson's 2017 report on the basis that it contains irrelevant, prejudicial, and confusing material based on the narrowing of this case during the stay pending resolution of the IPR proceedings. Motion, Dkt. No. 41 at 2–5.

Here, Mr. Gunderson was prepared to testify at trial regarding his 2017 report prior to the case being stayed. As previously discussed in Section V(B)(i), and consistent with the ruling on Alacritech's MIL No. 8, Mr. Bakewell is permitted to offers opinions regarding that and other inconsistencies, and Defendants may explore those inconsistencies through cross-examination; however, Defendants (including Mr. Bakewell) are not permitted to discuss the reasons why other patents have been dropped.

#### 2.  Mr. Bakewell and Other Witnesses are Precluded from Relying on the Valuation

Second, Alacritech seeks to exclude Mr. Bakewell's opinions about Alacritech's valuation. Motion, Dkt. No. 638 at 5–8. Alacritech contends that the '880 and '948 Patents had not issued at the time the valuation was conducted, did not directly value Alacritech's patent portfolio, and CFO

Connection—the company that performed the valuation—did not have access to all of Alacritech's confidential information.

Dell concedes that while the '948 and '880 Patents had not yet issued, the application that ultimately issued at the '880 Patent had already been filed and the application that issued at the '948 Patent was in the same family as the '205 Patent. Further, according to Dell, the valuation included Alacritech's non-cash assets, which inherently includes the Asserted Patents along with more than 50 other patents.

Here, the CFO Connection valuation does not include a valuation of the Asserted Patents. *See generally* Dkt. No. 641-6 (Valuation Report). Yet Mr. Bakewell relies on it to demonstrate the value of the Asserted Patents in this case. Mr. Bakewell's testimony regarding the valuation as indicative of the value of the Asserted Patents falls short of the requirements that "testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case," as required by Federal Rule of Evidence 702. FED. R. EVID. 702. As previously discussed in Section V(B)(ii), the valuation and any testimony regarding the valuation are excluded because any marginal relevance is substantially outweighed by the danger of unfair prejudice and misleading the jury. FED. R. EVID. 403. Cross-examination would not adequately cure the deficiencies in reliability and the unfair prejudice that may result from testimony regarding the valuation.

3. <u>Mr. Bakewell May Testify as to Whether One or Two Hypothetical Negotiations are Appropriate and Whether Mr. Gunderson Addressed All Considerations</u>

Third, Alacritech argues that Mr. Bakewell's opinion that the parties to the hypothetical negotiation would have only been Alacritech and Dell does not properly consider the facts. Motion, Dkt. No. 641 at 8–10.

Here, Mr. Bakewell offers opinions within his report criticizing Mr. Gunderson's lack of analysis regarding his opinion that a single hypothetical negotiation would apply. Dkt. No. 641-3 (Mr. Bakewell 5/12/23 Damages Report) at ¶¶ 34, 39. In contrast to *Caltech*, Mr. Bakewell only offers opinions on behalf of Dell—not on behalf of Dell and Intel. Alacritech asserts a different date of first alleged infringement for Dell and Intel. Mr. Bakewell may properly identify the different dates of first infringement, the potential differences in positions for Intel and Dell, and how the relevant evidence may be more or less relevant to Intel and Dell. Dkt. No. 641-3 (Mr. Bakewell 5/12/23 Damages Report) at ¶¶ 34, 39.

### 4. Mr. Bakewell is Permitted to Reference Dell's Patents and Development in a Manner Consistent with the Ruling on Alacritech's Mil No. 6

Third, Alacritech argues that Mr. Bakewell should be precluded from testifying about Dell's companywide patent portfolio and research and development (R&D) investments because they are unrelated to the accused products and the prejudice outweighs any marginal relevance. Motion, Dkt. No. 41 at 10–11.

Consistent with the ruling on Alacritech's Mil No. 6, Mr. Bakewell is permitted to testify regarding Dell's R&D generally, Dell's efforts to develop technology and their own patents, and that it is an innovator in this space, but he cannot specify a dollar-amount expenditure on R&D or a specific number of patents that Dell owns.

### C. Conclusion

For the reasons above, Alacritech's Daubert Motion to Exclude Testimony of W. Christopher Bakewell (**Dkt. No. 641**) is hereby **GRANTED IN PART** to exclude the CFO

Connection Valuation and any testimony regarding that valuation.  The motion is otherwise **DENIED.**

## VII.    CONCLUSION

In sum, Alacritech's *Daubert* Motions as to Mr. Hansen (**Dkt. No. 638**) and Mr. Bakewell (**Dkt. No. 641**) are **GRANTED-IN-PART** to the extent that the CFO Connection valuation and any opinions, argument, or testimony relying on it are excluded. Otherwise, the *Daubert* Motions (**Dkt. Nos. 631, 638, 641, 648**) are **DENIED**.

**SIGNED** this 8th day of October, 2023.

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE